AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### District of Massachusetts

|  |  |  |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| Lifeng Wu | ) | 23-5235-JGD |
| | ) | |
| | ) | **MJ 23-01825** |
| _____ | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____March 2021 through June 2022_____ in the county of _____Suffolk and elsewhere_____ in the

_____ District of _____Massachusetts_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(h) | (1) money laundering conspiracy, and |
| 18 U.S.C. § 1960 | (2) conducting unlicensed money transmitting business |

This criminal complaint is based on these facts:

See Attached Affidavit of DEA Special Agent Brady O'Donnell

☑ Continued on the attached sheet.

_____
*Complainant's signature*

DEA Special Agent, Brady O'Donnell
*Printed name and title*

Sworn to via telephone in accordance with Fed. R. Crim. P. 4.1

Date: _____04/13/2023_____

_____
*Judge's signature*

City and state: _____Boston, Massachusetts_____

Honorable Judith G. Dein, U.S. Magistrate Judge
*Printed name and title*

### AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Special Agent Brady O'Donnell, being duly sworn, depose and state that:

### INTRODUCTION

1.      I have been employed by the Drug Enforcement Administration ("DEA") since August of 2020.  I am currently assigned to the New England Field Division, Task Force 5 as a Special Agent, where I am tasked to investigate drug trafficking and money laundering organizations, and their ties to violent crime.  I graduated from the DEA Basic Agent Training Academy in Quantico, Virginia in December of 2020, where I received specialized training in narcotics and money laundering investigations and related legal matters.  Prior to my employment as a Special Agent, I was employed as a regional development officer for DeliverFund, which is a private counter-human trafficking intelligence company.  DeliverFund is based in Dallas, Texas and focuses on training state and local law enforcement in specialized counter-human trafficking investigative techniques.  Before that, I completed a graduate degree in Public Affairs from Brown University in Providence, Rhode Island, where I focused on policy related to national security, public safety, and transnational criminal investigative models.

2.      During my specialized training at the DEA Training Academy, I participated in numerous exercises to include the use of confidential informants, undercover operations, physical and electronic surveillance, telephone toll analysis, investigative interviews, and the execution of search and seizure warrants. In addition, I was further trained in specialized defensive tactics, firearms training, raid and entry tactics, judgmental shooting, and legal training.

3.      I have participated in many aspects of drug and money laundering investigations, including physical surveillance, surveillance of undercover transactions, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking and money laundering organizations.  I

1

am familiar with the benefits and limitations of these techniques. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed. I have also become familiar with the methods and means of moving payments for drugs and other illegal proceeds within and outside of the United States.

## PURPOSE OF AFFIDAVIT

4.      I submit this affidavit in support of a criminal complaint alleging that between at least March 2021 and June 2022, Lifeng WU ("WU" or the "Target Subject") engaged in a money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), and conducted an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960 (the "Target Offenses").

5.      Based on the facts in this affidavit, there is probable cause to believe that the Target Subject has committed the Target Offenses.

6.      I am familiar with the facts and circumstances of this investigation, and I have received information from a variety of sources, including but not limited to other law enforcement officers and agents, confidential sources, court ordered interception of wire communications, and my personal review of records and reports relating to the investigation.

7.      Since this Affidavit is being submitted for the limited purpose of securing the requested criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to demonstrate that there is probable cause for the requested complaint.

## PROBABLE CAUSE

### *Procedural History*

8.      On June 27, 2022, the Honorable Judith G. Dein, United States Magistrate Judge, authorized a criminal complaint charging (1) Chengzou Liu a/k/a "Sam" ("Liu"); (2) Qiu Mei Zeng

("Zeng"); (3) Shi Rong Zhang ("Zhang"); (4) Vincent Feng ("Feng"); (5) Da Zeng ("Da"); (6) Wei Qing Zeng ("Wei Qing"); (7) Xian Rong Zeng ("Xian Rong"); and (8) Qiu Fang Zeng ("Qiu Fang") (collectively, the "2022 Targets") with money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and conducting an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960. 22-mj-05218-JGD. The affidavit in support of that complaint incorporated the affidavit in support of residential search warrants related to the 2022 Targets, dated June 22, 2022. 22-5182-5186-JDG. The June 22 and 27, 2022 affidavits (together, the "2022 Complaint") are respectfully incorporated fully herein.

9.     The 2022 Targets were arrested on June 22, 2022 and all were released on conditions pending trial.

10.     On July 28, 2022, a federal grand jury in the District of Massachusetts returned an Indictment charging the 2022 Targets with money laundering and conducting an unlicensed money transmitting business. 22-cr-10185-IT.

11.     As set forth in the 2022 Complaint, the evidence against the 2022 Targets included three months of wiretap interceptions, including two months of intercepting Zeng's telephones, and one month of intercepting Zhang's telephone (identified as "Target Telephone 4" or "TT4"), in late 2021 and early 2022.

12.     WU was listed as a Target Subject and a Target Interceptee of Zhang's TT4 in the February 9, 2022 Wiretap Order.

13.     Based on the facts set forth in detail in the 2022 Complaint and below, there is probable cause to believe that between at least March 2021 and June 2022, WU engaged in a money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), including with the 2022 Targets, and conducted an unlicensed money transmitting business including with Zhang, in violation of 18 U.S.C. § 1960.

3

### Background of the Investigation

14.     In approximately January 2021, investigators with DEA began an investigation into the 2022 Targets, who were believed to be involved in laundering large quantities of U.S. currency, including proceeds from stolen gift cards and marijuana trafficking, and to be operating an unlicensed money transmitting business.  Based on the investigation to date, investigators believe the 2022 Targets were involved in numerous illegal schemes to transmit and launder tens of millions of dollars in illicit proceeds.

15.     Zhang and Zeng own and operate at least two Chinese restaurants in and around Boston, Massachusetts: China Gourmet in Chinatown, and Food Wall in Jamaica Plain.  As detailed in the 2022 Complaint, Zhang and Zeng used the premises of China Gourmet to operate their money laundering and unlicensed money transmitting businesses.  For example, throughout 2021 and into 2022, Zeng accepted large bags of bulk cash drug proceeds from her coconspirator Liu (a marijuana trafficker), for a fee, inside China Gourmet, and then wired Liu the equivalent in Chinese currency in his Chinese bank accounts, thereby allowing Liu to launder and expatriate his drug proceeds.  The cash delivered by customers such as Liu was then used by Zeng to operate the unlicensed money transmitting business in which Zeng and Zhang exchanged U.S. dollars ("USD") for Chinese Renminbi ("RMB").

16.     Based on my knowledge of money laundering and black-market currency exchanges, the individuals conducting these transactions often offer a discount from the currency exchange rate between RMB and USD for those looking to pick up USD and charge a fee for those looking to launder USD.  Based on my training, and experience, I believe brokers are able to offer this discount to customers seeking cash because they are being paid a commission by customers looking to launder the cash.  Because the cash constitutes illegal proceeds, criminals are willing to

pay a fee in order to move and clean their proceeds. This fee from those delivering cash offsets the discount offered to those retrieving cash. This illegal scheme benefits all parties. By charging a fee and offering a discount less than that fee, the broker still profits from the transaction. The criminal's drug proceeds never enter the U.S. banking system and effectively avoid U.S. banking reporting requirements and law enforcement detection. Chinese customers in the U.S. can acquire USD at a discount while avoiding China's capital flight restrictions, which prevent Chinese nationals from transferring large quantities of money out of China and thereby limit access to funds for those in the U.S.

17.     In addition to the money laundering fueled by illicit drug proceeds and the unlicensed money transmitting, the 2022 Complaint charged that Zhang, Zeng, Da, and Feng all worked together to conduct a trade-based money laundering scheme involving stolen gift cards and Apple products.

### *Trade-Based Money Laundering Scheme*

18.     As set forth below, and as detailed in the 2022 Complaint, investigators believe Da and Zhang were directly involved in obtaining stolen and/or fraudulent American Express gift cards, in bulk, from New York and other sources. Once in possession of the illegal gift cards, Zhang, Da, and a network of other "shoppers" purchased Apple products online and/or in store using these illicit funds. In particular, they often purchased Apple gift cards with the stolen and/or fraudulent American Express gift cards. I believe the purpose of this activity was to "clean" the illicit proceeds and hide the true nature and source of those funds. I also believe the purpose of this activity was to quickly remove and secure the value from the illicit gift cards before American Express could freeze the stolen account and/or before the rightful owner can lawfully use the funds on the card. Once in possession of "clean" Apple gift cards, Zhang, Da, and the shoppers used multiple Apple gift cards at a time to purchase Apple products, including iPads, laptops, and

iPhones. Zhang, Zeng, Feng, and others then used Zhang's putative electronics businesses (Wonderful Trading/Wonderful Electronics, and later Best Offer Trading) to ship these goods overseas, including to Dubai, United Arab Emirates ("UAE"). Once in Dubai, the devices were believed to be sold to countries in which Apple devices are otherwise not lawfully available or are prohibitively expensive. The funds from the international sale of these devices were then funneled back to the United States, including through wire transfers to Zhang and/or Feng's entities. I believe the purpose of this trade-based money laundering scheme was to hide the true nature and source of the illicit funds and secure "clean" funds on the back side. Finally, as alleged herein, WU helped further launder the funds out of the United States and into China by accepting USD wire transfers from Zhang, and then transferring the equivalent in RMB to various Chinese accounts controlled by Zhang.

*Zhang and Da Sourced and Used Stolen/Fraudulent Gift Cards to Purchase Apple Products*

19.     As detailed in the 2022 Complaint, court-authorized wiretap interceptions over TT4 confirmed that Da worked closely with Zhang to purchase Apple gift cards and Apple devices as part of this trade-based money laundering scheme. For example, on February 23, 2022, Da and Zhang had a lengthy conversation about purchasing Apple devices with gift cards. Da said that he had $80,000-$90,000 worth of gift cards. Zhang asked Da to bring those cards over to him so that he could divide them up and have "his people" (the shoppers) go wait in line for Apple devices. Da added that he had purchased six devices himself that day.

20.     Over the course of several weeks in February, March, and April 2022, investigators conducted surveillance of Da as he frequented different Apple stores in the Boston-metro area and purchased many Apple products. Investigators stopped Da on two of these occasions, and found him in possession of numerous Apple gift cards worth an estimated $60,000, several newly-purchased cell phones, numerous receipts for Apple Store transactions, and multiple powered-on

cell phones.  Both times, Da voluntarily spoke to investigators.

21.     When he was first stopped, on March 2, 2022, Da claimed to purchase $30,000-$50,000 worth of Apple gift cards per day, as well as six to seven Apple phones.  Investigators questioned Da about why he was using six different active phones.  Da showed investigators that five of the devices were not connected to cellular services, but rather only being used as "digital wallets" and were only connected to Wi-Fi.  Da showed investigators the Apple wallets on these devices, which each contained around 20 prepaid American Express gift cards valued at $500 each. Da explained that he used these American Express gift cards to buy Apple gift cards.  When asked why Da was using those numerous American Express gift cards as opposed to a credit or debit card to make these purchases, Da refused to answer and changed the subject.  Da was released without charges on this date, but investigators seized the gift cards.

22.     The second time investigators stopped Da, at the Cambridgeside Galleria mall on April 27, 2022, investigators also executed a warrant to seize and search Da's phones.  Da had a primary phone, as well as multiple other iPhones that Da was again using exclusively to access Apple Wallets loaded with American Express gift cards.  Da's primary phone contained numerous group chats in WeChat listing American Express gift card numbers.

23.     Da explained that he purchased the American Express gift cards through group chats on WeChat.  According to Da, he paid for the American Express gift cards at a discount in RMB, then the unknown individuals in the group chat sent Da the gift card numbers in the group chat.  Investigators asked Da why the American Express gift cards were being sold to him at a discount, but Da did not answer.  When asked if the American Express gift cards were stolen, Da took a long pause and responded, "Maybe," and explained that he knew a lot of the "gift card people" steal the gift cards but could not say for certain whether the cards he possessed in his

Apple Wallets that day were stolen. Da stated that he only buys Apple gift cards with the American Express gift cards, then he sells the Apple gift cards to three different people: Alan, Tony, and Mark. Investigators know "Alan" or "Allen" to be Zhang's alias.

24.     Investigators obtained records from Apple and American Express based on the receipts and records obtained from Da over the course of the investigation. These records indicate that Da used multiple American Express gift cards to purchase Apple gift cards, and that he and Zhang used those Apple gift cards to purchase Apple phones and other devices. Based on records from American Express related to the American Express gift cards shared in the WeChat group chat on Da's phone, investigators were able to contact the original purchasers of several of these American Express gift cards. At least one of these individuals confirmed that she had been the victim of credit card fraud, and that her card was used to purchase $16,000 worth of American Express gift cards. Based on this information, Da's statements about "gift card people" being involved in stealing cards, and the fact that Da admitted to obtaining the American Express gift cards at a discount, I believe the American Express gift cards used by Da represent proceeds of fraud and/or theft, and that Da and Zhang are using these illicit proceeds to purchase the Apple gift cards and, in turn, Apple devices, which are used to clean and/or facilitate their money laundering.

25.     Intercepted communications in the aftermath of March 2, 2022, when Da was first stopped by investigators confirm that Zhang and Da were purchasing Apple cards and products with fraudulent and/or stolen cards.

26.     For example, shortly after Da was stopped, Zhang spoke to a male using 617-774-9127 ("UM9127"), who investigators believe was involved in purchasing Apple cards/products along with Da. UM9127 suggested that they should all stop shopping otherwise they "will be ambushed." UM9127 stated that he had to "destroy and discard all the cards and everything with

all the receipts" when he got home. Zhang asked UM9127 about what will happen to the shoppers who were stopped: "If they get arrested, what will be the charges against them?" UM9217 responded that the government will trace the source of the cards and destination of the phones and may flip the shoppers into informants. Zhang responded that he knows that he is "playing edge ball" (believed to mean engaging in risky/illegal activity) and wondered what kind of evidence could be used to indict him. UM9217 responded that the government "can get the evidence easily." Based on these interceptions, investigators believe UM9217 worked closely with Zhang to operate his trade-based money laundering operation, and further believe the men were admitting that the "cards" being used to purchase Apple products were illegally obtained and/or represented illicit proceeds (hence why UM9217 had to "destroy and discard all the cards," because the government "will trace the source of the cards"). Investigators further believe Zhang and UM9217 were both aware of the illegal nature of their activities because they were wondering what crimes they may be charged with and were considering what evidence might be used against them.

27.     Zeng, for her part, was also intercepted discussing the fact that the "shoppers" were stopped by police at the Apple store. For example, on March 3, 2022 (the day after Da was stopped), Zeng spoke to a female using number 815-566-7213 ("UF7213") about the fact that investigators seized over $60,000 in Apple gift cards from Da. UF7213 suggested that Da could sue the police for seizing the cards without justification, to which Zeng responded, "How can you go sue them, when you, yourself is doing something illegal?"

28.     Several days later, on March 5, 2022, Zeng continued to discuss the recent law enforcement activity with UF7213. Zeng and UF7213 speculated about the origin of the investigation, and UF7213 suggested that the investigation may have stemmed from "other investigations against fraudulent credit card rings."

29.     Based on all of the above, investigators believe Zhang, Zeng, Da, and others use stolen and/or fraudulent gift cards to purchase Apple gift cards and Apple products as a means of hiding the source of the illicit funds.

*Zhang and Feng Exported Apple Products to Dubai*

30.     After the Apple products were obtained, investigators believe Zhang and Feng shipped these products to Dubai, UAE.  These products were shipped under the name of several companies controlled by Zhang and later Feng, including Wonderful Trading/Wonderful Electronics, and Best Offer Trading.

31.     For example, on February 11, 2022, Zhang called FedEx to track a package and provided the tracking number during the call.  Investigators reviewed tracking information for that package and determined that it was one of eight packages shipped from Hollis, New Hampshire to Dubai, UAE.  In a subsequent call on February 14, 2022, to an unknown male using 613-513-0306 ("UM0306"), Zhang discussed that he was having an issue with a FedEx package.  Zhang stated that he "sent eight boxes on Thursday, and then I was at Boston Airport around 9:00/9:30.  The next day I have a feeling something's wrong with the second box.  I happen to have shipment again on Friday, so I went there again and asked.  Everything else was about to arrive [in] Dubai, but only this one is still at East Boston….This box only has 44 Apple watches [inside]."  Based on these interceptions, investigators believe Zhang shipped multiple boxes of bulk Apple products (including at least 44 Apple watches), from the U.S. to Dubai, as part of his trade-based money laundering scheme.

32.     Investigators have also obtained FedEx records showing that, for example, in February 2022, Best Offer Trading (using an email address of wonderfulelectronic@gmail.com), shipped one parcel containing 384 cell phones with a total value of nearly $245,000 to Action

Logistics FZE in Dubai.  Investigators believe this reflects just one of hundreds of packages of Apple products shipped by Zhang and Feng to Action Logistics FZE in Dubai.

33.      Action Logistics FZE is a Dubai-based "freight forwarder," which according to public source information, specializes in clearing mobile phones and other electronics.  Based on my training and experience, I understand that logistics companies such as Action Logistics are often the first stop for stolen and/or fraudulently obtained electronics being shipped internationally.

*Zhang Amassed Proceeds in his U.S. Bank Accounts*

34.      Investigators have reviewed numerous financial records for Zhang and his various companies and have identified large incoming wire transfers from Dubai-based companies, including Action Logistics FZE.  Based on the investigation to date, I believe the wires from Action Logistics FZE reflect payments to Zhang for Apple products shipped by Zhang to Dubai, all in furtherance of the trade-based money laundering scheme.

<u>Zhang's Wonderful Electronics Santander Bank Account</u>

35.      Investigators reviewed records for a Santander Bank account for Wonderful Electronics, controlled by Zhang.  This account was opened in March 2021 and closed by the bank in July 2021.  In the approximately four months it was open, this account had nearly $26 million (mostly in large wire transfers) flow through it.  Wires from Action Logistics FZE accounted for over $4.5 million in deposits.

36.      An additional approximately $17 million dollars were received via wire transfers from Rocketdrop LLC.  According to public source information, Rocketdrop LLC is an electronics company in Salem, New Hampshire.  Based on the overall investigation to date, I believe Zhang was involved in laundering money between Wonderful Electronics and Rocketdrop and that the $17 million deposited into Zhang's Santander account represent illicit proceeds tied to the same

trade-based money laundering scheme.

37.     Santander Bank closed this Wonderful Electronics account in September 2021. Shortly thereafter, in October 2021, Feng opened a bank account at JP Morgan Chase ("JPMC") for a new company, Best Offer Trading Inc.  Feng created and registered Best Offer Trading on September 27, 2021 and listed its business address as Zeng and Zhang's China Gourmet restaurant. Although Feng listed only himself as owner, based on the investigation to date, investigators believe Feng created Best Offer Trading as a shell corporation to take the place of Wonderful Electronics, after Santander shut down Zhang's account.  I believe the purpose of Feng creating this company and the associated account was to allow Feng, Zhang, and others to continue their money laundering.

<u>Feng's Best Offer Trading JPMC Account</u>

38.     The transactions in the Best Offer JPMC bank account further suggest that this account was the successor pass-through account to Wonderful Electronics.  To start, the remaining balance of around $110,000 from a Wonderful Trading/Wonderful Electronics account was rolled over into this Best Offer account in November 2021.  As with the Wonderful Electronics Santander account, Action Logistics and Rocketdrop were the largest sources of incoming funds into the Best Offer Trading account.  Between October 2021 and April 2022, the total transacted through his account was approximately $5.4 million, which included $3.4 million from Action Logistics and $390,000 from Rocketdrop.

*WU Helped Zhang Further Launder the Proceeds*

39.     Based on a review of financial records, Zhang's accounts reflect that tens of millions of dollars of the proceeds received from Action Logistics and Rocketdrop were sent to WU's various shell corporations in the United States.

40.     According to publicly-available corporate records, WU—who resides in Canada—holds several shell companies in the United States including: **Zohoneer LLC; Maxtelli LLC, Cloudtelli Technologies LLC, and CardKuu Inc**. These entities are registered in various U.S. states, including Washington, Wyoming, California, and Oregon. For most of the entities, however, WU uses the business or mailing address of "9450 SW Gemini Dr., STE 92208, Beaverton, OR, 97008-7105." Based on a review of open-source data, investigators believe this address is a "virtual address" operated by Earth Class Mail. According to its website, Earth Class Mail accepts physical mail on behalf of its customers at this address and digitally scans the mail to its customers. This allows WU to have a physical address in the United States at which he can accept mail without needing to be personally located in the United States.

41.     As detailed below, a review of financial records for WU's various entities indicates that WU regularly moves funds between and among his entities. Based on my training and experience, I believe frequently moving large amounts of money between different companies controlled by the same individual is indicative of money laundering through the use of shell corporations. As also discussed below, these records also reflect a number of anomalous transactions which further indicate that WU uses his entities and related accounts to launder money.

42.     To start, of the approximately $26 million in credits to Zhang's Wonderful Trading account at Santander Bank between March and July 2021, a total of approximately $18 million was wired out to WU's accounts: Zohoneer LLC received approximately $5.4 million; Maxtelli LLC received approximately $12.8 million.

### WU's Zohoneer LLC Account at JP Morgan Chase

43.     The approximately $5.4 million wired from Zhang's Wonderful Trading to WU's Zohoneer was deposited into a Zohoneer account at JPMC. WU opened his Zohoneer JPMC

account around 2014.   Although he listed an address in Seattle, Washington as the business address, he listed the Earth Mail address in Beaverton, Oregon as the mailing address.   For his personal address, WU listed an address in Calgary, Canada.

44.   Between January 2020 and October 2021, when the account was closed, this Zohoneer account reflected deposits totaling approximately $13.5 million.   In turn, nearly all of the money deposited into Zohoneer account—over $12.6 million—was wired out to Maxtelli accounts at different banks within the U.S. and Canada.   Based on my training and experience, this type of activity is indicative of WU using his Zohoneer account merely as a pass-through account, meant to help obscure the original source of the funds in furtherance of the money laundering scheme.

<u>Maxtelli Accounts at Fifth Third Bank</u>

45.   Maxtelli had two accounts at Fifth Third Bank between 2020 and 2021.   The over $12 million wired from Wonderful Trading to WU's Maxtelli was wired into one of these accounts at Fifth Third Bank.

46.   As discussed above, when Wonderful Trading's account was shut down in approximately September 2021, Zhang enlisted Feng to help open Best Offer Trading to continue the laundering flow from the trade-based money laundering operation.   Between October 2021 and April 2022, Best Offer Trading's JPMC account wired over $2.6 to Maxtelli, thereby demonstrating the continued flow of funds to WU.

47.   Between January 2020 and July 2021, this Maxtelli Fifth Third Bank account also received nearly $5 million in wires from WU's Zohoneer account, as discussed above.

48.   Based on the investigation to date and the above, I believe the funds this Maxtelli account received from Wonderful Electronics, Best Offer Trading, and Zohoneer represent

proceeds of the trade-based money laundering operation from Zhang and/or Feng.  I therefore believe that WU used his business entities to facilitate money laundering (including using accounts for Zohoneer and Maxtelli as pass-through accounts).

*Communications between WU and Zhang Explain These Transactions*

49.     Although the flow of money described above would, alone, be indicative of money laundering, investigators have since identified and translated over a year's worth of communications between Zhang and WU which make clear the full nature and extent of the illegal scheme.

50.     When Zhang and his co-defendants were arrested in June 2022, investigators seized and searched telephones used by Zhang pursuant to a court-authorized search warrant.  On one of those devices, investigators located a WhatsApp group chat between WU, Zhang, and a third party (identified herein as "TJ").  The title of the group chat, created by WU, was "Alan USD."  As noted above, Alan/Allen is a known alias for Zhang.  Although the messages were primarily in Chinese, investigators have obtained draft transcripts of the communications, which are cited below.

51.     WU created the "Alan USD" group chat on or about March 24, 2021.  WU introduced Zhang to TJ and explained that WU and Zhang had reached an agreement earlier that day by which WU would purchase USD from Zhang so that WU had a stable and reliable source of USD in the United States, and further explained that TJ would then arrange to send Zhang the equivalent RMB to Zhang's accounts in China.  In response, Zhang asked whether the money could be paid via Alipay as it would be "less likely to be investigated."  Zhang asked WU about the sources of RMB in China.  WU explained that his customers were senior managers at big companies in China who wanted to transfer their wealth out of China, as well as education groups that need to pay tuition for students overseas.  WU also set an exchange rate for the transactions.

52.     As I described above with respect to the black-market currency exchange, I believe WU explained to Zhang that he wanted to purchase Zhang's USD to provide to his customers who were looking to access USD in the U.S. to avoid China's capital flight restrictions. I further believe that WU explained that in exchange for Zhang's USD, he and TJ would arrange for equivalent amounts to be transferred to Zhang's Chinese bank accounts. I believe this scheme helped Zhang export his illicit proceeds and help WU further his unlicensed money transmitting business, and that all of this was designed to avoid banking regulations, Chinese restrictions, and law enforcement detection by allowing the participants to exchange value without needing to physical move currency across borders.

53.     A search of FinCen's public Money Services Businesses database also reveals no registered money transmitting business for WU, Zohoneer LLC; Maxtelli LLC, Cloudtelli Technologies LLC, or CardKuu Inc.

54.     Between March 24, 2021 and June 22, 2022 (when Zhang was arrested), WU, Zhang, and TJ exchanged nearly daily communications in this Alan USD group chat in which they explicitly discussed the USD Zhang was sending to WU's various accounts, and the corresponding RMB transactions in China that TJ was arranging. Over the course of the relationship, WU provided Zhang with different accounts (including the Maxtelli and Zohoneer accounts discussed above) where Zhang could wire the USD. The chat also captured a September 30, 2021 chat in which Zhang told WU that he would be sending money from a new account, Best Offer Trading at JPMC, instead of Wonderful Electronics. As explained above, this change corresponds with the closure of Zhang's Wonderful Electronics account at Santander and Zeng's opening of the replacement account for Best Offer Trading.



55.     The men also shared details and photo proof of their frequent transactions, thereby creating something of a ledger of their illegal scheme.  For example, on May 24, 2021, Zhang sent WU a photograph confirming a $130,000 transfer from Zhang's Wonderful Electronics/Wonderful Trading Santander Account to WU's Zohoneer account at JPMC.





56.     Over the course of their relationship, there were times when WU or Zhang would need to exchange more money than usual.  For example, on October 25, 2021, WU told Zhang that he was in final negotiations with a customer who would need $5 million and $10 million in USD. WU asked Zhang to prepare.  Zhang said that he could send $250,000 and would need time to wire the rest.  As they went on to discuss how to wire this amount of money, WU explained that they would need to disperse the funds to different accounts because if one account received too many checks, the account would be inspected.  I believe WU was advising Zhang to structure this large transaction to avoid detection by US banking authorities.

57.     Again, in November 2021, WU told Zhang to be prepared for a demand of $1M USD per week for the next 10 weeks because WU had a "golden customer" who was interested in coming with 20 billion RMB (roughly $290 million USD) over the course of the next 1-2 years.

58.     The messages between WU, Zhang, and TJ also confirm that the men knew the illegal nature of their work.  For example, in June 2021, Zhang and WU discussed a hold that was placed on one of the accounts because the cash flow was too large, and the bank was asking about the source of the transfer.  The men decided that they needed to get their story straight so that they were all providing the same explanation to the bank on the receiving and paying end.  Ultimately, they settled on an explanation that the money was for "payment of a previous loan."  Based on the investigation to date, and the extensive conversations in this WhatsApp chat, this explanation was false and designed to hide their illegal money laundering and unlicensed money transmitting scheme.

59.     Similarly, on February 3, 2022, WU directed Zhang to wire money into three different banks and explained "only being dispersed can we stay safe and last long…we are linked together…this is good for everyone."  As above, I believe WU wanted Zhang to use multiple bank accounts to disperse the money and decrease the odds of being detected by regulators and/or law

enforcement and, therefore, "stay safe and last long" in their mutually beneficial illegal business together.

60.     Finally, on June 10, 2022, Zhang told WU about someone in New York who was in the business of money exchanging who got into trouble and made the news.  WU then sent Zhang an internet news article about a Chinese remittance agent in New York who was facing criminal charges for money laundering.  WU explained that he was not concerned because he did not send USD to China, and further explained that when he received $1 million in USD, he dispersed the money into thirty or forty different courier company accounts, and so his method was different.  Zhang responded, "OK, safety first."  I believe WU and Zhang were discussing this charged money launderer/money exchanger because they were engaging in similar criminal conduct and Zhang was worried about being caught.  I further believe WU assured him that their methods were safer.

61.     Zhang was arrested 12 days later and charged with money laundering and operating an unlicensed money transmitting business.

*WU's Accounts Reflect Other Suspicious Transactions*

62.     In addition to all the evidence of illegal activities detailed above, a review of WU's various accounts for his multiple companies also reveals a number of other anomalous transactions which I believe, based on my training and experience, are indicative of WU using these accounts to engage in other forms of money laundering for others as well.

63.     For example, nearly half of all deposits into WU's Zohoneer JPMC account—totaling approximately $6.1 million—came in the form of checks mostly from various New York-area small businesses.  These businesses included restaurants, hair/nail salons, clothing stores, and pharmacies.  WU often made multiple deposits in one day, for differing amounts, but which totaled a round figure (for example $10,000 and $20,000).  Based on my training and experience, I believe

these deposits are consistent with "structuring," a practice by which money launderers break up larger sums of money into smaller chunks in an attempt to avoid detection.  Notably, given that WU registered Zohoneer LLC in Washington State and personally lives in Canada, the fact that these deposits appear to come almost exclusively from New York-area businesses suggests that the funds being deposited do not reflect true business payments.  Additionally, during his conversations with Zhang in the group chat, WU complained that two of his accounts were frozen because of some "checks from New York" that were deposited into them.  Zhang told WU that he had already warned him about "the dirty stuff from New York."  Based on all of the above, and the investigation to date, I believe WU used Zohoneer and its JPMC account to facilitate money laundering transactions with New York entities looking to launder illegal proceeds.

64.     Other checks deposited into WU's accounts are also suspicious.  For example, in 2022, WU deposited into his various accounts dozens of checks that appear to be from online retailers such as Etsy.com, Amazon.com, and Poshmark.com.  These checks were often written for between $500-$3,000 each, and included multiple checks issued on the same or subsequent days.  For example, WU's Cloudtelli Technologies account at PNC bank reflects the following check deposits ostensibly from Amazon.com:

        a.  $986.56 check, dated July 6, 2022
        b.  $1,174.08 check, dated July 6, 2022
        c.  $558.56 check, dated July 6, 2022
        d.  $667.55 check, dated July 7, 2022
        e.  $987.12 check, dated July 7, 2022
        f.  $2,477.30 check, dated July 7, 2022
        g.  $603.27 check, dated July 8, 2022
        h.  $695.20 check, dated July 8, 2022

65.     WU's CardKuu, Inc. account at PNC Bank received dozens of check deposits apparently from the clothing consignment website Poshmark.com, including:

        i.  $570.58 check, dated July 6, 2022

    j.   $589.77 check, dated July 6, 2022
    k.   $2,158.19 check, dated July 6, 2022
    l.   $570.92 check, dated July 8, 2022
    m.  $822.00 check, dated July 11, 2022
    n.   $1,071.73 check, dated July 11, 2022
    o.   $777.08 check, dated July 11, 2022
    p.   $642.71 check, dated July 11, 2022
    q.   $526.69 check, dated July 12, 2022.
    r.   $200.00 check, dated July 12, 2022

66.    And WU's Maxtelli accounts at East West Bank and Umpqua Banks reflect checks that appear to be from online craft marketplace Etsy.com, including:

    s.   $1,155.45 check, dated July 27, 2022
    t.   $1,261.43 check, dated July 28, 2022
    u.   $711.21 check, dated July 28, 2022
    v.   $815.67 check, dated August 2, 2022
    w.  $435.00 check, dated August 2, 2022
    x.   $537.58 check, dated August 2, 2022
    y.   $506.32 check, dated August 2, 2022

67.    Etsy has no records of WU or Maxtelli operating any craft sales on its platform, nor does it have records of these checks being issued.

68.    A closer look at the checks themselves reveals why Etsy may have no records of these transactions: the checks appear to be fraudulent.







69.     The checks supposedly from Etsy, Amazon, and Poshmark, not only look similar on their face, but they also all bear the same signature, the same routing number, and the same originating bank account number.  Based on open-source data, these companies are not related to one another as business entities, and are certainly not related enough for them to use the same bank account.  Based on my training and experience, I believe these checks are fake checks made to look like deposits from online retailers as a means of hiding the true source of these funds.  I further believe WU's careful efforts to separate these checks into different accounts at different banks (for example, the Amazon checks all being delivered to Cloudtelli at PNC Bank while the Etsy checks were all written to Maxtelli at East West and Umpqua banks), was intended to avoid detection by any one bank, who might notice the similarity in these checks.

23

70.     Based on all of the above, I believe that WU uses all of his various companies merely as shell companies and uses their respective accounts as pass through accounts, all in furtherance of his money laundering and unlicensed money transmitting business.

71.     Based on the facts set forth above, there is probable cause to believe that between at least March 2021 and June 2022, WU engaged in a money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) and operating an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960.

_Brady O'Donnell_
Brady O'Donnell
Special Agent
Drug Enforcement Administration

Sworn via telephone in according with Fed. R. Crim. P 4.1 on this ___ day of April 2023.

**Apr. 13, 2023**

_Judith Gail Dein_
JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE